GRASSY LAKE & TYRONZA DRAINAGE DISTRICT No. 9 v. DRAINAGE DISTRICT No. 17.

4-7040                                        170 S. W. 2d 1007

Opinion delivered April 19, 1943.

*Sam Costen* and *Walter L. Pope,* for appellant.

*C. M. Buck,* for appellee.

HOLT, J. Drainage District No. 17 of Mississippi county, and its receivers, appellees, sued appellants,

Grassy Lake & Tyronza Drainage District No. 9 of Mississippi county, to enforce specific performance of a contract hereinafter set out.

The complaint is in two counts. In count one it is alleged that drainage district No. 17 was organized under Act 103 of 1917, and drainage district No. 9 in 1911, under the statutes (Chap. 52, Pope's Digest), and amendments; that the United States government, under the federal statute, commonly referred to as the Overton Flood Control Bill (33 U.S.C.A., § 701, Act 688 of the 74th Congress), undertook the construction of a levee along the east side of the Big Lake and "the right-hand chute of Little River in Mississippi county, in order to protect the lands lying east and south from the overflow of Little River. The federal statute required that before any work was done the state or district furnish assurances that payment would be made for all lands and easements necessary for the construction of the levee. The government, through its district engineer in Memphis, Tennessee, determined that the most practicable method to get these assurances was through the drainage districts through which the project would be constructed. The construction of the levee was to protect the land within the districts 17 and 9 from Little River overflow. The proposed levee does not pass through any of the territory of drainage district No. 9.

It was agreed among the commissioners of drainage district No. 9 and drainage district No. 17 and the Reconstruction Finance Corporation that certain land in drainage district No. 9 would be benefited by the levee and that drainage district No. 9 would contribute to the expense of acquiring necessary rights-of-way and easements. In order to comply with government requirements and to make certain that drainage district No. 17 would not have to pay for the necessary rights-of-way until drainage district No. 9 had contributed or obligated itself to contribute its just proportionate cost of said rights-of-way, drainage district No. 17, on November 12, 1937, passed a resolution directing its commissioners to execute and sign the rights-of-way and easement assurances required by the government, but not actually fur-

nish such rights-of-way until drainage district No. 9 had contributed its share of the cost. Subsequent to the passage of this resolution drainage district No. 17 adopted another resolution assuring the government that it would furnish all land and easements necessary for the construction of the proposed levee. It was agreed between the two districts that since each district was without funds to pay for the necessary rights-of-way it would be necessary for each district to secure funds from the Reconstruction Finance Corporation. The R.F.C. agreed with the commissioners of both districts that it would furnish the necessary funds.

In consummation of their agreement the two districts, on April 19, 1938, entered into the following contract: "This agreement entered into at Blytheville, Arkansas, on the 18th day of April, 1938, by and between Grassy Lake & Tyronza Drainage District No. 9 of Mississippi county, Arkansas, and Drainage District No. 17 of Mississippi county, Arkansas, witnesseth: Whereas, it is necessary that Grassy Lake & Tyronza Drainage District No. 9 secure funds from the R.F.C. with which to pay for right-of-way and flowage rights, in compliance with the requirements of the United States government under the St. Francis Levee Flood Control Project, authorized in Public Act No. 678 of the 74th Congress, and, whereas, it is necessary that Drainage District No. 17, of Mississippi county, Arkansas, likewise secure funds from the R.F.C. for the same purpose, and in order to comply with the requirements of the same project; and whereas it is agreed by and between said districts that Drainage District No. 9, heretofore mentioned, will receive certain benefits from the construction of said project, and especially that portion of the Little River floodway encompassing the Big Lake area, and should contribute a sum of money to said project for the purchase of rights-of-way and flowage rights within the Little River floodway area, now,

"Therefore, it is agreed by and between Grassy Lake & Tyronza Drainage District No. 9 and Drainage District No. 17 of Mississippi county, Arkansas, that the R.F.C. may, out of the funds which it is to furnish to Grassy

Lake & Tyronza Drainage District No. 9, charge to said Drainage District No. 9, aforesaid, the sum of seventy thousand ($70,000) dollars, and credit said sum to Drainage District No. 17 of Mississippi county, Arkansas, said seventy thousand ($70,000) dollars so charged and credited to be used by Drainage District No. 17 of Mississippi county, Arkansas, solely for the purpose of securing rights-of-way and flowage rights in the construction of the project above set out, said seventy thousand ($70,000) dollars to be furnished by Grassy Lake & Tyronza Drainage District No. 9 with the understanding, and in consideration of Drainage District No. 17, of Mississippi county, Arkansas, furnishing the remainder of the funds necessary to secure rights-of-way and flowage rights for construction of the project above set out.

"Witness the signatures of the parties hereto, by their respective commissioners.

"Grassy Lake & Tyronza Drainage District No. 9
    by /s/ G. B. Segraves
       /s/ C. W. Ramey
"Drainage District No. 17, of Mississippi
County, Arkansas,
    by /s/ V. G. Holland, Chairman
       /s/ B. A. Lynch, Sec.-Treas."

Following this agreement, Drainage District No. 17, by appropriate proceedings, secured the necessary rights-of-way and easements at a cost of $270,000, which was paid by Drainage District No. 17. The levee, throughout the length of Drainage District No. 17, has been constructed and the rights-of-way paid for by Drainage District No. 17.

It is further alleged that the necessary bonds, pledges and trust agreements were prepared for Drainage District No. 9 to secure a loan of $100,000 from the R.F.C., but that the commissioners of Drainage District No. 9 have refused to sign and execute bonds, pledges and trust agreements required by the Reconstruction Finance Corporation to secure said loan, and Drainage District No. 9 has refused to comply with the provisions of its contract, *supra,* with Drainage District No. 17, to

pay to it $70,000 which it agreed to pay. It is alleged that Drainage District No. 9 is without funds except those arising from assessments of taxes upon the benefits assessed in said drainage district, all of which are pledged to secure the bonds issued by said district No. 9; that Drainage District No. 17 entered into the contract in good faith, secured and paid for the rights-of way required by the federal government, relying upon said contract and upon Drainage District No. 9 complying therewith and repaying Drainage District No. 17 $70,000; that unless Drainage District No. 9 is required to perform the contract Drainage District No. 17 "will be defrauded out of the said sum of $70,000 and will be irreparably injured." The county court of Mississippi county approved the contract or agreement entered into between Drainage District No. 17 and Drainage District No. 9 and made and entered the following order: "Upon due consideration, of said contract, it is considered ordered and adjudged that said contract be and the same is hereby approved and said drainage districts are hereby authorized and empowered to proceed with the work contemplated by said contract." There was a prayer for specific performance of the contract in question, that the commissioners of Drainage District No. 9 be required to sign and deliver the necessary bonds, pledges, deeds of trust and trust agreements required by the R.F.C. to secure the loan of $100,000 to the end that the R.F.C. be enabled to charge $70,000 with interest to Drainage District No. 9 and credit this amount to Drainage District No. 17.

Count 2 of the complaint is in effect a reiteration of the allegations in count 1 except that it is alleged that by reason of Drainage District No. 9 breaching the contract in question, Drainage District No. 17 has been damaged in the amount of $70,000, and prays for judgment for this amount.

Appellants answered, and here we quote from appellants' brief: "Drainage District No. 9 answered, denying there would be any benefits to Drainage District No. 9 by the work described in the complaint; admits the passage of the resolutions and the making of the con-

tract, but alleges the contract was *ultra vires* and null and void; alleges no change of plans and specifications were made and filed in the county court by Drainage District No. 17, nor was there any approval by the county court for the doing of said work, nor was it advertised so as to give the landowners the chance to be heard, and alleges the contract was purely a private transaction by the commissioners of the two districts and beyond their power and authority to bind the two districts.''

In an amendment to the complaint, appellee alleges that there was duly organized in 1924, and exists in Drainage District No. 9, Subdrainage District No. 3, and that the commissioners of Subdrainage District No. 3 are the same persons who constitute the commissioners of Drainage District No. 9; that Drainage District No. 9, in order to comply with the contract of April, 1938, *supra*, between districts 17 and 9, deemed it proper for Subdistrict No. 3 to secure the loan from the R.F.C. and out of this loan secured by Subdrainage District No. 3, Drainage District No. 9 would pay Drainage District No. 17 the $70,000 in question. It was further alleged that the R.F.C. approved the loan to Subdrainage District No. 3 and prepared and submitted for execution the necessary papers to Subdrainage District No. 3; that two members of the board of commissioners of Subdrainage District No. 3 executed the papers, but that the third member refused to execute same and for this reason the R.F.C. refused to approve the loan and Drainage District No. 9 was unable to pay Drainage District No. 17 the $70,000.

Appellants answered this amendment to appellee's complaint, denying the material allegations therein.

Charlie Lutes, on behalf of himself and other landowners and taxpayers within the boundary of Drainage District No. 9, intervened and denied the material allegations of appellee's complaint and specifically alleged that the commissioners of Drainage District No. 9 were without power and authority to enter into the contract and agreement with Drainage District No. 17; that the attempt to do so was void; that the land in Drainage Dis-

trict No. 9 received no benefits; that the benefits were not equal and uniform over the land of the district, and prayed that the complaint be dismissed for want of equity.

In a cross-complaint, interveners alleged that the commissioners of Drainage District No. 9 were without power to enter into the contract with Drainage District No. 17, *supra;* that the levee which the government constructed was of no benefit to Drainage District No. 9 and was not a part of the plans of said district when it was organized and was not contemplated, and that the land within said district was afforded no additional protection from overflow by Little River by the construction of the government levee. They further alleged that the levy of taxes upon the present assessment of benefits by Drainage District No. 9 to secure the amount necessary to pay the said $70,000 would constitute irreparable damage to defendants and the taxpayers within the district, would violate their constitutional rights, prayed for injunctive relief and that the contract aforesaid, between districts 17 and 9, be declared void and canceled.

Upon a trial the court declared the issues in favor of appellees and decreed specific performance of the contract in question. This appeal followed.

The primary question presented and which we think is decisive of this case is: Was the contract or agreement which was entered into on April 19, 1938, between Drainage District No. 17 and Drainage District No. 9 *ultra vires,* or beyond the power of district No. 9 to make?

It is conceded that the resolutions, which were made a part of appellee's complaint, were passed as alleged, and that the contract or agreement, alleged and set out therein, was entered into by Drainage District No. 17 and Drainage District No. 9 and subsequently approved by an order of the Mississippi county court.

Appellants earnestly contend that the action of the commissioners of Drainage District No. 9, in executing the contract or agreement in question, was *ultra vires* for the reason that the levee in Drainage District No. 17,

constructed by the government, was not within, and not contemplated under, the original plans of Drainage District No. 9 when it was organized, and that before Drainage District No. 9 could be bound to pay for any part of the construction of this levee it was necessary that a new district be organized, proper procedure taken to assess the taxes on the assessed benefits on the land within the district equitably before the taxpayers within district No. 9 could be made to pay assessments to repay the $70,000 in question to Drainage District No. 17.

A preponderance of the testimony, as reflected by this record, is to the following effect: Drainage District No. 17 was organized subsequent to 1917, and Drainage District No. 9 in 1911. Subdrainage District No. 3 was organized in 1924 and comprises practically all of the land within Drainage District No. 9 and has the same board of commissioners. In 1927, 1930 and 1937 large parts of these districts were overflowed by Little River. District No. 9, in 1927, through its Subdrainage District No. 3, spent $31,455.97 in its fight against high water, $20,015.90 for reconstruction of spoil bank along east side of ditch No. 1, and $5,300.35 in its fight against high water in 1930, or a total of $56,772.22. Drainage District No. 9, after its organization in 1911, constructed a large ditch with a continuous spoil bank, designated as ditch No. 1 (sometimes called "Kochtitzky ditch or levee"), but this ditch and spoil bank proved ineffective against the overflows above mentioned. Floodway levees along the right and left banks of Big Lake and the right-hand chute of Little River had been constructed by Drainage District No. 17, according to its plans, and these levees had also proved inadequate against the overflows. All of the levee in question here lies outside of Drainage District No. 9 and wholly within Drainage District No. 17. The rights-of-way for this levee were procured for the government by Drainage District No. 17 at an expense to Drainage District No. 17 of $270,000, which has been paid by this district. Drainage District No. 9 paid nothing to Drainage District No. 17 on these rights-of-way.

The federal government rendered much assistance to these districts in the flood fight of 1927, but govern-

ment engineers, as well as the engineers of the districts affected, recognized that to prevent these fights against overflows, and to save expense, it would be necessary to construct proper levees to protect the districts in question here, and other contiguous districts, from the overflows of Little River in the St. Francis valley. Following the 1937 overflow, the negotiations between the two districts were begun that led up to the execution of the contract in question in 1938, and the building of the levee by the government under the Overton Flood Bill. It appears that the levee was designated and constructed, according to the testimony of Blair A. Ross, a government engineer, to protect not only the land of Drainage District No. 17, but also the land of Drainage District No. 9 which lies south and east of Drainage District 17; that it was designed to protect approximately 96,000 acres in Drainage District No. 17 and 104,000 acres in Drainage District No. 9.

Mr. L. L. Hidinger, the engineer for Drainage District No. 9, testified that "Grassy Lake & Tyronza Drainage District No. 9, Mississippi county, Arkansas, was organized under the General Drainage Laws of Arkansas in 1911, and the commissioners had plans prepared immediately thereafter. The plans adopted by the district consisted of two main elements, first, the protection of the land in the district from overflow from Little River; and, second, the drainage of the lands within the district."

These districts were unable, without the help of the government, to build the necessary levees to protect them from the overflows of Little River. Without the protection of the levee which the government built the land in the two districts would be of little value.

Unquestionably, the purpose and plan of the land-owners in Drainage District No. 9 in organizing and creating the district was to construct or build the necessary ditch with spoil bank, or levee, to protect their land from overflow and to secure drainage. Under the statutes under which this drainage district was created the word "ditch" or "ditches" includes and embraces "levees." (§ 4489, Pope's Digest.) When it had been

clearly demonstrated by the various floods, *supra,* that this ditch and spoil bank in Drainage District No. 9 was insufficient to give the land in Drainage District No. 9 the protection under the plans contemplated when the district was organized, it is our opinion that the commissioners of the district had the power, in the absence of fraud, to enter into an agreement, such as we have here; to secure the necessary protection which necessity seemed to demand.

The preponderance of the evidence also shows that the payment of the $70,000 involved here would not make it necessary to levy additional benefits nor would it increase the tax rate upon the benefits now existing. In considering the protection afforded the land in the district by the levee, the entire district must be considered. Some of the land would be benefited by drainage and other land protected from overflows. And, as indicated, where the plan of the district, as here, is not only to drain, but to afford levee protection to the land from overflow, we must assume that the benefits are so assessed as to be equitable when both objects have been obtained.

We think the principles of law announced in the very recent case of *Drainage Dist. No. 18* v. *Cornish,* 198 Ark. 857, 131 S. W. 2d 938, apply with equal force here. In that case Drainage District No. 18 of Craighead county had paid to Drainage District No. 7 of Poinsett county $100,000 for the privilege of using the outlet which Drainage District No. 7 afforded through its inverted siphon. Water was carried by this siphon from both Drainage District No. 18 of Craighead county and Drainage District No. 17 of Mississippi county, was constructed by Drainage District No. 7 of Poinsett county and lies wholly within the latter district. In that case we held (quoting headnotes): "1. A drainage district may construct a levee where necessary to prevent the overflowing and filling up of its ditches, and although a portion of the proposed levee lies outside the drainage district, it is not *ultra vires* the district to construct the levee nor to acquire the right-of-way therefor.

"2. Under Act 279 of 1909, § 32 (Pope's Dig., § 4489), empowering drainage districts to construct levees

where necessary to protect its drains, it may not only acquire the right-of-way therefor, but it may acquire it for another agency to build the levees for it.

"3. The legislature in enacting Act 279 of 1909, known as the Alternative Drainage System, intended to confer every power necessary to complete drainage schemes.

"4. Drainage district may, under Pope's Dig., § 4480, condemn lands for a right-of-way for a levee lying in part without the district when such levee is necessary to protect the drainage system.

"5. Under Acts 67 and 212 of 1937 and 83 of 1939, appellant had the right to contract with the federal government to secure the right-of-way for, and for the payment of incidental damages arising out of the construction by the federal government of levees necessary for the protection of the drainage system."

In assessing betterments in Drainage District No. 9 it was contemplated that protection from the floodwaters of Little River was necessary and it was assumed that the embankment along the west bank of ditch No. 1 or the Kochtitzky ditch, would afford that protection. It was found, however, that this Kochtitzky levee was inadequate for this purpose. At the recurrence of each annual overflow great expense was required to maintain this Kochtitzky levee, and these efforts were not always successful.

This Kochtitzky levee was an essential part of the plans of Drainage District No. 9 upon which betterments were assessed and without the protection which the Kochtitzky levee was supposed to afford the whole scheme or plan of the improvement in Drainage District No. 9 became ineffective and unavailing for the reason that the levee was essential to the drainage of the land.

Now, Drainage District No. 17 found itself in the same situation, so far as protection from the floodwater of Little River was concerned, but neither district had funds available to afford this protection. In this situation it was found by the government engineer, who deter-

mined what assistance might be given by the federal government to any improvement district, that a single levee would afford the protection which both districts required. This levee was one to be constructed within the boundary of Drainage District No. 17. It was agreed, as herein above stated, that the government would furnish the funds which both districts required but neither had, but upon the condition that Drainage District No. 9 would furnish $70,000 of the funds required for this purpose. The Flood Control Commission was unwilling, and apparently without authority under the Flood Control Act, to acquire rights-of-way, flowage rights, etc., all of which were to be acquired by Drainage District No. 17 where the proposed levee was to be constructed.

The legal question which determines whether the contract made on behalf of Drainage District No. 9 was *ultra vires* is whether that district had the right to construct a levee beyond its boundaries. The case of *Bayou Meto Drainage Dist.* v. *Ingram,* 165 Ark. 318, 264 S. W. 947, appears to be decisive of that question as it was there held that an outlet ditch for drainage purposes might be constructed lying without the original boundaries of the district and there is, of course, the same authority for the construction of a levee as there would be for the construction of a ditch. In the Ingram case, it is said: "There are several sections of the drainage statute which have some bearing on the question of authority to do the things undertaken in the present instance. One of the sections of the statute (Crawford & Moses' Digest, § 3629, 4480, Pope's Dig.) provides for the condemnation of a proper outlet for the drainage system, and that for that purpose a ditch or drain may be extended beyond the limits of the district."

No error appearing, the case is affirmed.

Robins, J., (dissenting). I respectfully dissent from the opinion of the majority in this case. The statute under which this district was created, and from which its officers derive their powers, provides (§§ 17, 22, Act 279, approved May 27, 1909) a method by which the district may make necessary improvements not included in the

original plans and by which assessments to defray the cost of such additional improvements may be made against the lands of the district in proportion to the benefits accruing to them from the new work. Under the method prescribed by the statute the landowner has—as he should have—an opportunity to be heard on the question of the necessity of making such additional improvements and on the question of the fairness of the assessment therefor. In the case at bar it is not claimed that this statutory proceeding has been followed, but we have here an attempt to fix upon the taxpayers of this district the burden of a large indebtedness solely by the act of two members of its Board of Commissioners in signing a contract to pay out funds of the district. Since the commissioners took none of the steps prescribed by the statute for the making of the new and additional improvement they did not have the power to bind the district to pay the cost of this improvement or any part thereof. In my opinion, the judgment of the lower court should be reversed and the cause dismissed.

I am authorized to state that Chief Justice GRIFFIN SMITH concurs in this opinion.